**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FABRICE KAMAYOU, | |
| Plaintiff, | |
| v. | Civil Action No. |
| UNIVERSITY OF MASSACHUSETTS, LOWELL, UNIVERSITY OF MASSACHUSETTS, LOWELL POLICE DEPARTMENT, BOHDAN ZARYCKYJ, MARK SCHAAF, and SCOTT CHILDS, | |
| Defendants, | |

---

**COMPLAINT AND JURY DEMAND**

---

For his Complaint against the University of Massachusetts, Lowell, the University of Massachusetts, Lowell Police Department, Bohdan Zaryckyj, Mark Schaaf and Scott Childs, Plaintiff Fabrice Kamayou states as follows:

**I.      Parties**

(1) Plaintiff Fabrice Kamayou ("Mr. Kamayou") is an individual with a place of residence in Framingham, Middlesex County, Massachusetts.

(2) Defendant University of Massachusetts, Lowell ("UMass Lowell") is a public institution of higher education with a campus located at 1 University Avenue, Lowell, Middlesex County, Massachusetts.

(3) Defendant University of Massachusetts, Lowell Police Department (the UMass Lowell PD"), is a public police authority with a principle office at University Crossing, 220 Pawtucket Street, Suite 170, Lowell, MA 01854.

(4) Defendant Bohdan Zaryckyj ("Mr. Zaryckyj") is an employee and agent of UMass Lowell with a place of business at 1 University Avenue, Lowell, Middlesex County, Massachusetts.

(5) Defendant Mark Schaaf ("Detective Schaaf") is an employee and agent of the UMass Lowell PD with a place of business at University Crossing, 220 Pawtucket Street, Suite 170, Lowell, MA 01854.

(6) Defendant Scott Childs ("Sergeant Childs") is an employee and agent of the UMass Lowell PD with a place of business at University Crossing, 220 Pawtucket Street, Suite 170, Lowell, MA 01854

## II.     Jurisdiction and Venue

(7) This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1343 (a)(3), 28 U.S.C. §1331, 28 U.S.C. §1367, 42 U.S.C. §1981, and 42 U.S.C. §1983.

(8) Venue is appropriate in this Court because the Plaintiff and all Defendants live or work within Middlesex County which is located within the venue of the United States District Court for the Eastern District of Massachusetts.

## III.    Facts

(9) Mr. Kamayou is 27 years old, the first child of a family of six.

(10)      Mr. Kamayou is originally from Cameroon.

(11)      Mr. Kamayou grew up in France and graduated from High School with Honors at the age of 16.

(12)     Mr. Kamayou's parents made the difficult decision to send him to the United States to pursue his education.  They did so in the hope of providing their son what they perceived to be the best possible opportunity in life.

(13)     Mr. Kamayou's father, retired now, was a diplomat working for over two decades for the Cameroonian Embassies in Moscow, Brussels, and Algiers.

(14)     He also covered shorter diplomatic missions in several other countries (China, South Africa, and Peru, among others) before getting appointed, in 2004, to work in Cameroon for the National Election Observatory (NEO) to monitor and control the transparency of the 2004 Presidential Elections.

(15)     After those elections in Cameroon, the results published nationally were not reflecting the actual results.

(16)     Mr. Kamayou's father and a few members of his team disagreed and objected to the results.

(17)     This moral stance did not bode well because it contradicted the ruling political regime of President Paul Biya, which has held all political power in Cameroon since November 6, 1982 (and still does to this day).  Wikipedia states the following in Biya's biography: "his regime still retains clear authoritarian characteristics and has largely bucked the trend toward democracy in Africa since the 1990s. Under the constitution, Biya has sweeping executive and legislative powers. He even has considerable authority over the judiciary; the courts can only review a law's constitutionality at his request. The RDPC [Biya's party] continues to dominate the National Assembly, which does little more than approve his policies."

(18)     The moral position against Biya taken by Mr. Kamayou's father caused serious

issues for Mr. Kamayou and his family.

(19)     Indeed, members of the election review committee working with Mr. Kamayou's

father lost their children in very suspicious ways; some were abducted and killed while

others went missing and were never found.

(20)     Cameroon was no longer safe for the Kamayou family.  The Kamayous hastily

sent their children to France to finish the school year.

(21)     Mr. Kamayou's parents then hastily sent Mr. Kamayou to the United States in

January 2006 on a Student Visa.

(22)     Ultimately, Mr. Kamayou's parents left Cameroon in August 2006 and entered

the United States on political asylum status.

(23)     When Mr. Kamayou arrived in the United States in 2006, he did not know a word

of English.

(24)     He immediately enrolled in an English as a Second Language program at a two-

year college, Mount Wachusett Community College ("MWCC").

(25)     Incredibly, within six months, Mr. Kamayou was fluent in English, giving him the

ability to register for regular college courses.

(26)     He studied at MWCC for two years, was part of the Honors program, and

obtained an associate degree in Liberal Arts and Science.

(27)     He graduated with Honors in December 2008.

(28)     Mr. Kamayou made these accomplishments at long odds and through

extraordinary efforts.

(29)     Going to school was not an easy task for Mr. Kamayou.

(30)     Without financial means (both of his parents had lost their jobs when they fled

Cameroon), he had to supplement his academic efforts with part-time employment during

each semester.  Nonetheless, he persisted and flourished.

(31)     After gaining his associates degree, Mr. Kamayou made the life-altering decision

to transfer to UMass Lowell.

(32)     There, he continued his academic excellence.

(33)     He did so while working 40 hours per week as a residential counselor at the

Institute of Professional Practice caring for mentally disabled individuals.

(34)     Unlike his college peers, Mr. Kamayou did not enjoy free time on weekends or

even a social life.  He devoted himself fully to his work and studies.

(35)     He was also a commuter student because he could not afford living on campus.

(36)     Nonetheless, after only three semesters at UMass Lowell, he obtained a B.S. in

Mathematics/Option BioInformatics; graduating with a 3.9 GPA in May 2011.

(37)     After fleeing his country of birth, moving from France to the United States, and

learning English as a second language, his long, painful journey appeared to be paying

off.

(38)     Mr. Kamayou had bright plans for his future.

(39)     He applied to UMass Lowell's graduate school, seeking a degree in applied

mathematics.

(40)     UMass Lowell took notice.  He was admitted to the graduate school and the Chair

of the Math Department, Stephen Pennell, was so impressed with Mr. Kamayou's efforts

and achievements that he approved Mr. Kamayou as a Teaching Assistant for the Math

Department at UMass Lowell.  This position provided Mr. Kamayou a stipend of about $7500 per semester.

(41)    As a teaching assistant, Mr. Kamayou worked closely with two faculty members, Professor Thomas Oliveri and Professor Harry Rosenstein.

(42)    Mr. Kamayou's duties included correcting and grading homework and exams for undergraduate students (about 12 hours of work per week) as well as tutoring undergraduate students in a tutoring center at UMass Lowell (about 6 hours per week).

(43)    Even with this vigorous curriculum and work schedule, Mr. Kamayou maintained a perfect 4.0 GPA in the UMass Master of Science graduate school program.  *See* Exhibit 1.

(44)    Ever ambitious, Mr. Kamayou at the same time began teaching at MWCC as a part-time Faculty member; teaching two night courses every semester.

(45)    Mr. Kamayou began formulating his ultimate educational and professional goals. He expected to graduate from UMass Lowell with his perfect G.P.A. and continue his higher education in mathematics at Brown University.  After obtaining a PhD, he planned to work for a company in an Applied Mathematics field or continue as a faculty member at a university.

(46)    All of those hopes and dreams of this talented, hard-working individual seem to have been catastrophically dashed by the events of January 2013.

(47)    First, on January 10, 2013, a former girlfriend (in a spat of jealousy) falsely accused Mr. Kamayou of "kidnapping" her after a dispute involving his new girlfriend.

(48)    As a result of the false allegation, a charge of "attempted kidnapping" was brought against Mr. Kamayou.  This charge was later dismissed by the Court.

(49)     However, during the pendency of the "attempted kidnapping" charge, the accuser, who was also a UMass Lowell student, informed UMass Lowell of the charges and requested that Mr. Kamayou be barred from campus and expelled from school.

(50)     Without any notice to Mr. Kamayou, a hearing being offered, or any findings being made regarding these false claims, simply followed the instruction of the accuser and placed Mr. Kamayou on immediate suspension.

(51)     These actions violated Mr. Kamayou's Constitutional Due Process Rights.

(52)     This pre-determined decision to back the accuser and find Mr. Kamayou "guilty" without obtaining the facts also set the stage for multiple violations of Mr. Kamayou's rights that followed.

(53)     Again, without notice to Mr. Kamayou, a hearing provided to him, or any findings being made, UMass Lowell issued a no-trespass order against Mr. Kamayou barring him from campus.

(54)     This again violated Mr. Kamayou's Constitutional Due Process Rights.

(55)     At that time, Mr. Kamayou was represented by counsel in the Clinton District Court relating to the "attempted kidnapping" charge brought by the accuser.

(56)     In disregard of this fact and in violation of Mr. Kamayou's 6th Amendment right to counsel, on January 24, 2013, Mr. Kamayou was summoned by UMass Lowell and its Police Department, both state actors, *without* his attorney to meet Bohdan Zaryckyj, its Coordinator of Student Conduct.

(57)     Mr. Kamayou was ordered to meet two UMass Lowell police officers (Detective Mark Schaaf and Sergeant Scott Childs).  Mr. Kamayou was improperly taken into

custody by these officers and illegally delivered for interrogation to Mr. Zaryckyj at his university office.

(58)     In violation of his Constitutional Rights, Mr. Kamayou was not advised of the reason for his detention, was not read any rights (such as Miranda Rights), was not offered the opportunity to speak with his counsel, and was not provided opportunity to contact his counsel.

(59)     The purpose of the encounter was to be interrogate Mr. Kamayou regarding the charges brought against him in Clinton District Court, without counsel present.

(60)     Mr. Kamayou was placed in custody and forced to Mr. Zaryckyj's enclosed office with the officers standing guard outside.

(61)     Mr. Zaryckyj spent the next half hour interrogating Mr. Kamayou about the Clinton District Court matter without counsel present and without offering Mr. Kamayou the opportunity to contact counsel.

(62)     It became clear to Mr. Kamayou that Mr. Zaryckyj was not being fair-minded and was interrogating him for the purpose of assisting the criminal case against him.

(63)     Mr. Zaryckyj then demanded that Mr. Kamayou provide a written statement regarding the events and left the room.

(64)     Overwhelmed with the events (that appeared on the verge of destroying his life), Mr. Kamayou called his sister in a panic.

(65)     She reminded him of his attorney's instruction not to speak with *anyone* regarding the Clinton case without his attorney's presence.

(66)     He remembered this advice and became distraught.

(67)     He became utterly dismayed and disoriented.

(68)    He needed to leave and to speak with his counsel.  Mr. Zaryckyj refused.

(69)    The ensuing events are a blur, but Mr. Zaryckyj and the UMass Lowell officers allege that Mr. Kamayou attempted to leave the office with notes of the interrogation written by Mr. Zaryckyj.

(70)    At that, Mr. Zaryckyj instructed the officers to physically restrain Mr. Kamayou and to forcibly take the alleged notes from Mr. Kamayou's person.

(71)    At Mr. Zaryckyj's instruction, the officers pounced upon Mr. Kamayou and exerted a savage beating upon him.

(72)    The beating was so excessive that, in addition to sustaining severe injuries, the officers noted in their report that Mr. Kamayou defecated himself.

(73)    In a wrongful attempt to cover-up their multiple violations of Mr. Kamayou's civil rights (including their extreme and excessive use of force), Mr. Zaryckyj, Detective Schaaf, and Sergeant Childs (being state actors and acting in their capacities as employees and agents of UMass Lowell and the UMass Lowell PD) initiated and promulgated three false criminal charges against Mr. Kamayou; (1) malicious or wanton damage to property (Mr. Zaryckyj's notes); (2) larceny from building (i.e. alleged theft of Mr. Zaryckyj's notes); and resisting arrest.

(74)    The charges were frivolous on their face.  Among other things, the notes were not necessary to Mr. Zaryckyj's review of this matter and were easily recreated.  Certainly, there was no reason to beat Mr. Kamayou into submission to obtain such notes even if they existed and were in the possession of Mr. Kamayou.  More importantly, even the officers' warped rendition of events show the notes were obtained by violating Mr.

Kamayou's Sixth Amendment Rights and, therefore, were not properly obtained from the outset.

(75)     "Under the Sixth Amendment to the Federal Constitution, the Commonwealth [and its agents such as UMass Lowell and its police department or agents] may not deliberately elicit 'statements from the defendant in the absence of his counsel, once formal adversary proceedings have commenced.'" *Commonwealth v. Abrante*, 70 Mass. App. Ct. 1112, *2 (2007).

(76)     In regards to the claims brought by UMass Lowell and Mr. Zaryckyj against Mr. Kamayou, they were subjected to a motion to dismiss in Lowell District Court. Counsel for Mr. Kamayou argued, *inter alia*, (1) that the UMass Lowell police officers, aware that Mr. Kamayou had already been charged in the Clinton District Court on the "attempted kidnapping" claim, unconstitutionally took Mr. Kamayou into custody and delivered him to Mr. Zaryckyj for interrogation, (2) that the UMass Lowell state actors further violated Mr. Kamayou's civil rights when Mr. Kamayou asked to suspend the interrogation to discuss the matter with his counsel and the UMass Lowell officials refused, and (3) that the "property" Mr. Zaryckyj alleged had been maliciously damages and stolen from his office was not considered "property" under the malicious destruction of property statute.

(77)     The Court agreed and immediately dismissed the fraudulent charges in Counts 1 and 2 brought at the instruction of Mr. Zaryckyj.

(78)     Nonetheless, and in order to further retaliate against Mr. Kamayou and to shield their civil rights violations regarding the beating they inflicted, Mr. Zaryckyj, Detective Mark Schaaf and Sergeant Scott Childs insisted on pursuing their false claim of resisting

arrest against Mr. Kamayou through trial.  They lost the claim and Mr. Kamayou was fully vindicated by acquittal after trial.

(79)     However, the experiences set forth above, thrust Mr. Kamayou's life into chaos and came at great personal and financial cost.

(80)     Nonplused, UMass Lowell, through the retaliatory actions of Mr. Zaryckyj, pursued further disciplinary actions against Mr. Kamayou with a vindictive zeal.

(81)     On February 22, 2013, while the criminal matters were still pending, Mr. Zaryckyj instigated and conducted a purported Campus Conduct Board Hearing against Mr. Kamayou.

(82)     He did so while he now knew he had placed Mr. Kamayou in jeopardy with the false criminal charges set forth above.

(83)     This hearing too was conducted without proper notice, opportunity to be heard, right to be represented by counsel and without fundamental fairness – all in violation of Mr. Kamayou's Constitutional Rights under the Fourth and Sixth Amendments to the Constitution.

(84)     The hearing was concluded with a predetermined outcome to expel Mr. Kamayou.

(85)     To compound matters, UMass Lowell inexplicably refuses to issue the graduate degree that Mr. Kamayou had already earned *before* any of the above events took place.

(86)     To reiterate, Mr. Kamayou obtained a B.S. in Mathematics from UMass Lowell in May 2011.

(87)     Before graduating with that degree, he had applied and was accepted in UMass Lowell's so-called 4+1 program (Bachelor's to Master's Program).

11

(88)　　　UMass Lowell's parameters for graduating from the MS in Applied and

Computational Mathematics program contain four options.  The option pursued by Mr.

Kamayou, Applied and Computational Mathematics.  This option required a total of 30

credit hours, which may include certain required courses and electives.

(89)　　　Mr. Kamayou met these requirements as reflected on his transcript (Exhibit 1),

and set forth as follows:

- 92.507 (MATH.5070) (Fall 2011)(3 credits)
- 92.530 (MATH.5300) (Fall 2011)(3 credits)
- 92.562 (MATH.5630) (Spring 2012)(3 credits)
- 92.572 Optimization, 92.526 Topology, 92.651, 92.521 Abstract Algebra I, 92.551 Calculus of Variations, 92.651 Selected Topics in Math (Actuarial Mathematics), 92.651 Selected Topics in Math (Partial Differential Equation) (Total: 18 credits)
- The final three credits were obtained through undergraduate course credits.  Per the UMass policies (*see* https://www.uml.edu/Catalog/Graduate/Bachelors-Masters.aspx) the graduate degree granting department allows course credit benefits where: 1- Any graduate courses taken by a baccalaureate degree student that are credited towards the Master's degree have been obtained with a grade of B or better. 2- The courses are of 500 level or higher. 3- a maximum of 12 graduate credits (500 level or above) may be used for the master's degree. 4- Students must petition to have specific courses (500 level or above) taken during their undergraduate career apply towards their graduate degree via an Academic Petition. Mr. Kamayou met these criteria.

(90)　　　At the time of the incidents in January 2013, Mr. Kamayou was a Teaching

Assistant at UMass Lowell, receiving a stipend of about $7500 per semester.

(91)　　　The only reason Mr. Kamayou had not already been issued a UMass Lowell

graduate degree was that he was gaining teaching experience (at the request of UMass

Lowell) and, therefore, had registered for the spring of 2013 simply to take additional

courses that the school was offering to him for free.

(92)　　　When Mr. Zaryckyj suspended Mr. Kamayou without due process (and in

violation of his other Constitutional Rights as set forth above) in January 2013, Mr.

Kamayou did not have the opportunity to petition to have his undergraduate coursework be applied to the final three credits needed for his graduate degree.

(93)     It is apparent that the goal of Mr. Zaryckyj became not just to expel Mr. Kamayou, but to purposefully destroy his life due to the unfortunate incidents in January 2013 and to use as leverage to shield his violation of Mr. Kamayou's civil rights.

(94)     The conclusion that a retaliatory vendetta against Mr. Kamayou was pursued is impossible to avoid.  At the time of the incident, the rational course would have been to review Mr. Kamayou's situation (a 4.0 graduate student, valedictorian of his graduate class, a teaching assistant employed by the school, and someone who had never had a single disciplinary problem) and given him the benefit of the doubt regarding a very questionable claim made by an angered former girlfriend.

(95)     Moreover, even if UMass Lowell officials had a legitimate concern that Mr. Kamayou was a "risk" to the school (which it did not), it could have negotiated an easy resolution of the matter – i.e. allowing Mr. Kamayou to petition for his undergraduate coursework to be applied to his graduate degree and confer the graduate degree he had earned, letting both parties move on.

(96)     Rather than take such rational steps that were mandated by their covenant of good faith under their contract with Mr. Kamayou, UMass Lowell refused to issue the degree and still refuses to do so to this day.

(97)     Worse, with malicious intent, UMass Lowell purposefully interferes with Mr. Kamayou's efforts to obtain his graduate degree from other institutions by falsely informing those schools that Mr. Kamayou's tenure at UMass Lowell ended with a

13

"WITHDRAWAL FOR DISCIPLINARY ACTION" and further falsely informs those schools that Mr. Kamayou is a "danger to the university community."

(98)    As a result, even when Mr. Kamayou has attempted to move on and obtain his degree elsewhere, he is informed by those universities that his "disciplinary record reflects conduct that has been inconsistent with the standards and expectations we have for our students."  This quote, for instance, was sent in a letter of denial from Boston University.

(99)    Therefore, as a proximate result of the actions of UMass Lowell, and its continued refusal to issue the earned degree and continued insistence on claiming Mr. Kamayou's withdrawal from the university was for disciplinary reasons and that he is a danger to the community, Mr. Kamayou is completely unable to earn a degree or pursue his life goals.

(100)    These actions have literally destroyed Mr. Kamayou's life and the damages that these actions have caused, and continue to cause, are astronomical as it has deprived him of the opportunity to gain appropriate employment.

**IV.    Causes of Action**

## COUNT I

(Violation of 42 U.S.C.A. § 1983, Civil Rights Act v.
Bohdan Zaryckyj, Mark Schaaf and Scott Childs)

(101)    Mr. Kamayou restates and realleges each of the above paragraphs and incorporates them herein by reference.

(102)    Bohdan Zaryckyj, Mark Schaaf and Scott Childs deprived Mr. Kamayou of his civil rights, including but not limited to his rights under the First, Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution as more fully set forth above.

(103)    These actions, among other things, included conducting an unlawful search and seizure of Mr. Kamayou, the unlawful deprivation of Mr. Kamayou's liberty and property without due process of law by falsely arresting him and maliciously prosecuting him, by seeing to the false imprisonment of Mr. Kamayou, by engaging in an abuse of process scheme in order to insulate and defend their wrongful acts, by assaulting and battering Mr. Kamayou, by employing cruel and unusual punishment against Mr. Kamayou, by using excessive force against Mr. Kamayou, and purposefully depriving Mr. Kamayou of due process in regards to the determinations to withhold his degree.

(104)    In taking the unlawful actions described in this Complaint, these defendants acted under the color of local and state law, including the authority granted in them as officials of UMass Lowell and as police officers of the UMass Lowell PD.

(105)    The acts and practices of these defendants subjected Mr. Kamayou, or caused him to be subjected, to the deprivation of the rights, privileges and immunities secured by the United States Constitution and laws of the United States, including but not limited to his rights under the First, Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(106)    Mr. Kamayou is entitled to be compensated for the violations of his civil rights as provided in 42 U.S.C.A §1983 et seq. and as otherwise allowed at law and in equity in an amount to be determined at trial.

## COUNT II

(Intentional Infliction of Emotional Distress v. All Defendants)

(107)    Mr. Kamayou restates and realleges each of the above paragraphs and incorporates them herein by reference.

(108)    Through the conduct alleged in this Complaint, UMass Lowell, the UMass Lowell PD, Bohdan Zaryckyj, Mark Schaaf and Scott Childs intended to inflict emotional distress upon Mr. Kamayou or knew or should have known that emotional distress was likely to result from the extreme and outrageous conduct set forth above.

(109)    The conduct set forth in the Complaint, and to be further proven at trial, was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community.

(110)    The conduct set forth in the Complaint, and to be further proven at trial, caused Mr. Kamayou to suffer extreme emotional distress.

(111)    Mr. Kamayou's emotional distress was severe and of a nature that no reasonable person could be expected to endure.  Mr. Kamayou suffered both emotional distress and physical symptomology of that distress as a result of the conduct set forth herein.

(112)    Mr. Kamayou seeks compensation for the harm inflicted upon her in an amount to be determined at trial.

## COUNT III

### (Malicious Prosecution/Abuse of Process v. All Defendants)

(113)    Mr. Kamayou restates and realleges each of the above paragraphs and incorporates them herein by reference.

(114)    Bohdan Zaryckyj, individually and as an agent of UMass Lowell, used legal process to bring criminal complaints against Mr. Kamayou regarding the incident in Mr. Zaryckyj's office described above.

(115)    Mark Schaaf and Scott Childs, individually and in their positions as members of

the UMass Lowell PD, used legal process to bring criminal complaints against Mr.

Kamayou regarding the incident in Mr. Zaryckyj's office described above.

(116)    These defendants instituted criminal process with actual malice.  Among other

things, their use of legal process was for the illegitimate and ulterior purpose of providing

a defense to their unlawful violation of Mr. Kamayou's civil rights.

(117)    These defendants instituted and pursued this criminal process without probable

cause and in utter bad faith.

(118)    The malicious process instituted by these defendants terminated in favor of Mr.

Kamayou – two of the false charges were dismissed prior to trial while the third false

charge resulted in an acquittal on all charges after trial.

(119)    The unlawful abuse of process and malicious prosecution set forth herein directly

and proximately resulted in damage to Mr. Kamayou, both monetary and reputational, in

an amount to be determined at trial.

## **COUNT IV**

(False Arrest and False Imprisonment v. All Defendants)

(120)    Mr. Kamayou restates and realleges each of the above paragraphs and

incorporates them herein by reference.

(121)    Bohdan Zaryckyj, individually and as an agent of UMass Lowell, exercised

unlawful confinement of Mr. Kamayou, including his confinement both during and after

his unlawful seizure in being brought to Mr. Zaryckyj's office, his detention at Mr.

Zaryckyj's office, his arrest after the detention at Mr. Zaryckyj's office and his unlawful

imprisonment by the UMass Lowell PD thereafter.

(122)    Mark Schaaf and Scott Childs, individually and in their positions as members of

the UMass Lowell PD, exercised unlawful confinement of Mr. Kamayou, including his

confinement both during and after his unlawful seizure in being brought to Mr.

Zaryckyj's office, his detention at Mr. Zaryckyj's office, his arrest after the detention at

Mr. Zaryckyj's office and his unlawful imprisonment by the UMass Lowell PD thereafter

(123)    The unlawful confinement of Mr. Kamayou by these defendants was intentional.

(124)    Mr. Kamayou was conscious of the confinement exerted against him.

(125)    Mr. Kamayou has been damaged as a direct and proximate result of his false

arrest and imprisonment in an amount to be determined at trial.

## COUNT V

(Assault and Battery v. Bohdan Zaryckyj, Mark Schaaf and Scott Childs)

(126)    Mr. Kamayou restates and realleges each of the above paragraphs and

incorporates them herein by reference.

(127)    Mark Schaaf and Scott Childs engaged in an unlawful assault and battery of Mr.

Kamayou at the direction and with the assistance of Bohdan Zaryckyj, as described in

detail above.

(128)    These defendants first put Mr. Kamayou in fear of offensive contact of his body

and then inflicted a severe beating of upon his body.

(129)    The assault and battery resulted in numerous physical injuries and resulted in Mr.

Kamayou defecating himself.

(130)    Mr. Kamayou has been damaged by the assault and battery inflicted upon him in

an amount to be determined at trial.

## COUNT VI

(Violation of 42 U.S.C.A. § 1983, Civil Rights Act v. UMass Lowell and UMass Lowell PD)

(131)    Mr. Kamayou restates and realleges each of the above paragraphs and incorporates them herein by reference.

(132)    Upon information and belief, the unconstitutional actions of Bohdan Zaryckyj, Mark Schaaf and Scott Childs implemented or executed a policy, statement, or decision officially adopted and promulgated by UMass Lowell and the UMass Lowell PD.

(133)    The practices and actions aimed at and carried out against Mr. Kamayou appear to be so well settled by UMass Lowell and the UMass Lowell PD that they constitute a custom or usage by UMass Lowell and the UMass Lowell PD and its officers and agents. These customs, practices and actions now appear to carry the force of law.

(134)    These customs, practices and actions are so pervasive that, upon information and belief, UMass Lowell and UMass Lowell PD policy makers had actual or constructive knowledge of and acquiesced to the unconstitutional customs and practices.

(135)    In addition, UMass Lowell and UMass Lowell PD, upon information and belief, failed to properly train, supervise, and discipline its employees and agents, including Bohdan Zaryckyj, Mark Schaaf and Scott Childs, to prevent such customs and practices from manifesting themselves through the UMass Lowell faculty and UMass Lowell PD officers.

(136)    Mr. Kamayou is entitled to be compensated for the violations of his civil rights as provided in 42 U.S.C.A 1983 et seq. and as otherwise allowed at law and in equity in an amount to be determined at trial.

## COUNT VII

### (Defamation v. UMass Lowell)

(137)    Mr. Kamayou restates and realleges each of the above paragraphs and incorporates them herein by reference.

(138)    UMass Lowell defamed Mr. Kamayou, and continues to defame Mr. Kamayou, as set forth more fully above, including falsely stating to universities where Mr. Kamayou applies for enrollment that Mr. Kamayou was withdrawn from UMass Lowell for disciplinary reasons and by further falsely stating that Mr. Kamayou has committed certain crimes and/or is a violent and physical danger to the university community.

(139)    UMass Lowell published these false and defamatory statements to third parties, including any and all universities to which Mr. Kamayou applies.

(140)    UMass Lowell makes these false statements with vindictive malice and in bad faith.

(141)    These statements are false, were known by UMass Lowell to be false when they were made, and tend to hold Mr. Kamayou up to scorn, hatred, ridicule and contempt, in the minds of a considerable and respectable segment of the community – including the university admissions community.

(142)    As a proximate result of these false statements and UMass Lowell's continued defamation, Mr. Kamayou has been, and continues to be, harmed and is entitled to damages as determined at trial.

**COUNT VIII**

(Intentional Interference With Advantageous Relations v. UMass Lowell)

(143)     Mr. Kamayou restates and realleges each of the above paragraphs and
incorporates them herein by reference.

(144)     Mr. Kamayou, by virtue of his excellent academic record and credentials, had
prospective advantageous relationships with the universities where he applied for
enrollment.

(145)     UMass Lowell knowingly induced and continues to induce the destruction of
these relationships by defaming Mr. Kamayou to these universities when they inquire
about Mr. Kamayou's credentials.

(146)     UMass Lowell's interference with these prospective relationships, in addition to
being intentional, is improper in motive or means – including a vindictive and retaliatory
scheme to harm Mr. Kamayou, to protect UMass Lowell's unlawful conduct as set forth
in this Complaint, and to deter Mr. Kamayou from asserting his Constitutional Rights.

(147)     As a direct and proximate result of UMass Lowell's continued interference with
Mr. Kamayou's prospective advantageous relations, Mr. Kamayou has been, and
continues to be, harmed and is entitled to damages as determined at trial.

**COUNT IX**

(Breach of Contract and Covenant of Good Faith v. UMass Lowell)

(148)     Mr. Kamayou restates and realleges each of the above paragraphs and
incorporates them herein by reference.

(149)     Mr. Kamayou and UMass Lowell entered into a valid and binding agreement
when Mr. Kamayou became a student at the school.

21

(150)    Among other things, the agreement required Mr. Kamayou to perform well in his studies, meet certain curriculum requirements and be a good citizen at school.  Mr. Kamayou satisfied his obligations.

(151)    UMass Lowell was obligated by this agreement to, among other things, treat Mr. Kamayou fairly and in good faith, to provide due process to Mr. Kamayou, to refrain from violating Mr. Kamayou's Constitutional Rights, and to confer any degree and diplomas to Mr. Kamayou which he earned from his studies.

(152)    UMass Lowell's actions set forth herein, including its wrongful refusal to confer a graduate degree which Mr. Kamayou has earned and a corresponding diploma to Mr. Kamayou are breaches of contract and violate the covenant of good faith and fair dealing that is inherent in the agreement.

(153)    As a direct and proximate result of UMass Lowell's continued interference with Mr. Kamayou's prospective advantageous relations, Mr. Kamayou has been, and continues to be, harmed and is entitled to damages as determined at trial.

## COUNT X

(Violation of 42 U.S.C.A. § 1983, Civil Rights Act v. UMass Lowell)

(154)    Mr. Kamayou restates and realleges each of the above paragraphs and incorporates them herein by reference.

(155)    UMass Lowell has deprived Mr. Kamayou of his civil rights, including but not limited to his rights to due process and property under the First, Fourth, and Fourteenth Amendments to the United States Constitution due to its refusal to confer Mr. Kamayou his earned graduate degree and diploma.

(156)    The violation of Mr. Kamayou's civil rights include, among other things, conducting an unlawful search and seizure of Mr. Kamayou, the unlawful deprivation of Mr. Kamayou's liberty by falsely arresting him and maliciously prosecuting him, by seeing to the false imprisonment of Mr. Kamayou, by engaging in an abuse of process scheme in order to insulate and defend the school's wrongful acts, by allowing the assault and battery of Mr. Kamayou by its employees, by employing cruel and unusual punishment against Mr. Kamayou, by using excessive force against Mr. Kamayou, and purposefully depriving Mr. Kamayou of due process in regards to the determinations to withhold his degree and diploma, and by the act of withholding his degree and diploma.

(157)    In taking these unlawful actions, UMass Lowell acted under the color of local and state law, including the authority granted in it by the Commonwealth of Massachusetts.

(158)    The acts and practices of UMass Lowell subjected Mr. Kamayou, or caused him to be subjected, to the deprivation of the rights, privileges and immunities secured by the United States Constitution and laws of the United States, including but not limited to his rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

(159)    Mr. Kamayou is entitled to be compensated for the violations of his civil rights as provided in 42 U.S.C.A § 1983 et seq. and as otherwise allowed at law and in equity in an amount to be determined at trial and by an Order requiring UMass Lowell to confer a graduate degree and diploma upon Mr. Kamayou.

**COUNT XI**
**(Specific Performance)**

(160)    Mr. Kamayou restates and realleges each of the foregoing paragraphs as if fully set forth herein.

(161)    As set forth above, the agreement between the parties requires UMass Lowell to confer a graduate degree and diploma to Mr. Kamayou and to refrain from defaming him to other third parties, including universities to which Mr. Kamayou applies for enrollment.

(162)    UMass Lowell has violated the agreement and continues to violate the agreement as set forth above.

(163)    Unless UMass Lowell is prevented from engaging the aforesaid unlawful acts, UMass Lowell will continue to violate the agreement and will continue to destroy Mr. Kamayou's efforts to benefit from the agreement and move on with his life.

(164)    UMass Lowell will not suffer any harm by an order of specific performance; requiring UMass Lowell to confer a graduate degree and diploma upon Mr. Kamayou and to refrain from defaming him to other third parties, including universities to which Mr. Kamayou applies for enrollment.

(165)    Mr. Kamayou requests that this Honorable Court use its equitable powers to Order UMass Lowell to specifically perform its obligations under the easement agreement – i.e. ordering UMass Lowell to carry out its obligation to confer a graduate degree and diploma upon Mr. Kamayou and to refrain from defaming him to other third parties, including universities to which Mr. Kamayou applies for enrollment.

## COUNT XII

### (Declaratory Judgment v. UMass Lowell)

(166)    Mr. Kamayou restates and realleges each of the foregoing paragraphs as if fully set forth herein.

(167)    An actual controversy has arisen between Mr. Kamayou and UMass Lowell regarding their respective rights and obligations under their contract.

(168)    Among other things, UMass Lowell refuses to carry out its obligation to confer a graduate degree and diploma upon Mr. Kamayou and refuses to refrain from defaming Mr. Kamayou to other third parties, including universities to which Mr. Kamayou applies for enrollment.

(169)    From the clear terms of the agreement between the parties, including the covenant of good faith and fair dealing, UMass Lowell does not have the right to so continue its breaches of the agreement.

(170)    Pursuant to G.L. c. 231A, Mr. Kamayou prays that this Honorable Court make the following declarations regarding the agreement between Mr. Kamayou and UMass Lowell: (1) that Mr. Kamayou has satisfied all obligations necessary for the conferring of his graduate degree and diploma; (2) that in violation of its obligations under its agreement with Mr. Kamayou, UMass Lowell refuses to carry out its obligation to confer a graduate degree and diploma upon Mr. Kamayou; (3) that UMass Lowell must confer a graduate degree and diploma upon Mr. Kamayou; (4) that UMass Lowell must refrain from defaming Mr. Kamayou to third parties with false statements regarding his withdrawal from the university and his "danger" to the university community; (5) make such other declarations as deemed appropriate by this Court regarding the parties' agreement.

## V.    **<u>Jury Demand</u>**

Mr. Kamayou hereby demands a trial by jury on all counts so triable.

**WHEREFORE**, Mr. Kamayou requests that this Honorable Court:

1.      Enter judgment in favor of Mr. Kamayou on each count stated herein;

2.      Award Mr. Kamayou all damages, costs, interest and attorney's fees recoverable

at law and in equity;

3.      Enter the declaratory judgment requested in Count XII and make such

declarations as are contained therein or that this Honorable Court finds just and

proper; and

3.      Award such other and further relief as this Honorable Court finds just and proper.


Respectfully submitted,

**PLAINTIFF FABRICE KAMAYOU,**

By his attorney,

/s/ Timothy J. Perry
Timothy J. Perry (BBO #631397)
tperry@pkdllp.com
PERRY KRUMSIEK LLP
One Boston Place, Suite 2600
Boston, MA  02108
(617) 720-4300
facsimile (617) 720-4310